## COMMONWEALTH vs. KIRK FERNETTE.

Plymouth. September 9, 1986. — November 26, 1986.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & O'CONNOR, JJ.

*Homicide. Robbery. Assault and Battery by Means of a Dangerous Weapon. Assault with Intent to Murder. Practice, Criminal, Voluntariness of statement, Argument by prosecutor, Deliberation of jury, Instructions to jury. Evidence, Admissions and confessions, Tape recording. Felony-Murder Rule. Proximate Cause. Jury and Jurors.*

In the circumstances, a defendant's possible hunger and fatigue on the morning of his arrest did not render his statements to police involuntary. [662-664]

A tape recording which comprised a total of one hundred minutes of a 127-minute interview of a criminal defendant by police was not rendered inadmissible, at his trial for murder, by reason of the fact that the recording had been interrupted at several points, either for mechanical reasons or to accommodate the defendant's personal needs, where there was no evidence that the recording was not a fair representation of the defendant's statement or that the police had sought to obtain an unfair advantage by interrupting the recording. [664-665]

A single misstatement of the cause of the victim's death, during the prosecutor's closing argument at a murder trial, when considered in light of his entire argument and the curative instructions given by the judge, did not require reversal of the defendant's conviction. [665-666]

No substantial risk of a miscarriage of justice was created where, pursuant to an agreement between prosecution and defense, the jury at a murder trial, during their deliberations, were given unrestricted access to a tape-recorded statement made by the defendant to police. [666-667]

The defendant at a murder trial was not entitled to have the jury instructed that he was relieved of liability if the jury should find that poor medical treatment intervened between the shooting of the victim and his death. [667-668]

On the evidence at the murder trial of one of two armed intruders who shot the victim in his home during a robbery, the jury could properly find the defendant guilty of murder in the first degree on the theory of deliberately premeditated malice aforethought. [668-669]

In his instructions to the jury at a murder trial, the judge adequately defined all of the elements of proof required for conviction of first degree felony-

murder based on the underlying felony of armed robbery, committed with a loaded gun. [669-670]

At a murder trial the judge appropriately instructed the jury as to their duty to return a verdict of guilty of the highest crime which has been proved against the defendant beyond a reasonable doubt. [670]

This court rejected the contention that a judge, in instructing the jury in a criminal case, should inform them of their power to return a verdict which does not comport with the judge's instructions. [670-671]

Where, at the trial of indictments charging assault, while armed with a dangerous weapon, with intent to kill, the evidence presented the jury with a factual issue whether, in firing "bird shot" at three police officers pursuing him, the defendant intended to kill them or only to discourage pursuit, it was reversible error for the judge not to instruct the jury that, for conviction of this offense, the Commonwealth must prove beyond a reasonable doubt that the defendant harbored a specific intent to kill. [671-672]

INDICTMENTS found and returned in the Superior Court Department, six on October 3, 1983, and one on October 24, 1983.

A pretrial motion to suppress evidence was heard by *George Jacobs*, J., and the cases were tried before him.

*Rosemary Ford* for the defendant.

*Mary Ellen O'Sullivan,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J. The defendant, Kirk Fernette, appeals from his convictions of murder in the first degree, armed robbery, assault with intent to rob a victim over sixty-five years old, G. L. c. 265, § 18 (a) (1984 ed.); assault and battery by means of a dangerous weapon on a victim over sixty-five, G. L. c. 265, § 15A (1984 ed.); and three convictions of assault, while armed with a dangerous weapon, with intent to murder, G. L. c. 265, § 18 (b) (1984 ed.). On appeal the defendant argues that it was error to deny his motion to suppress his statement to the police, which was tape recorded, because it was not voluntary and because the police stopped the tape recorder at times during the making of the statement. The defendant also argues that he was unfairly prejudiced by remarks made by the prosecutor during closing argument; he was prejudiced by the jury's unrestricted access to his tape recorded statement during deliber-

ations; the jury instructions concerning proximate cause did not permit the jury to consider the medical care given the victim; the instructions defining murder in the first degree were erroneous; the instructions pursuant to *Commonwealth* v. *Dickerson,* 372 Mass. 783 (1977), were faulty; and the instructions on the intent requirement for the assault, while armed with a dangerous weapon, with intent to murder were erroneous. The defendant also asks us to grant him relief pursuant to G. L. c. 278, § 33E. We conclude that the defendant is entitled to relief under *Commonwealth* v. *Freeman,* 352 Mass. 556 (1967), on the basis of the erroneous instruction regarding the three convictions of assault with intent to murder. The convictions of murder in the first degree, armed robbery, assault with intent to rob a victim over sixty-five years old, and assault and battery by means of a dangerous weapon on a victim over sixty-five years old are affirmed. On the conviction of murder in the first degree, we decline to exercise our power under G. L. c. 278, § 33E, in favor of the defendant.

We summarize the facts.[1] On September 19, 1983, the defendant and Glen Bourgeois, a codefendant,[2] robbed and shot Hollis Jackson, age seventy-five, at his home in Middleborough. The weekend prior to the shooting, the defendant and Bourgeois had visited friends in Middleborough. During the weekend, each man was seen cleaning and loading guns.[3] On Monday morning, September 19, the two men left Middleborough on route to Florida. Both men were armed and had enough money for a bus ticket.

As they headed to the bus station, the defendant and Bourgeois passed the home and barn of the victim. The victim kept his car in the barn. The two men went into the barn and saw the victim's automobile. The victim entered shortly thereafter and offered the two men a ride part of the way to the bus

---

[1] Further facts will be discussed as they relate to each specific claim of error.

[2] The codefendant, Glen Bourgeois, was tried separately and is not before us on this appeal.

[3] The defendant cleaned and loaded a .22 caliber gun. He also drilled holes in the barrel "so it wouldn't be as loud."

station, which the men accepted. When the victim let the men out of his car, they decided to return to the victim's home and wait for him so that they could take his money and his automobile. On the victim's return, he was blindfolded, gagged and tied to his bed, after having his pockets emptied of money and his automobile keys. According to the defendant, he remained with the victim while his codefendant went to the store to get sodas. The defendant claims that during this period of time he loosened the ties on the victim. As soon as his codefendant returned from the store, the men prepared to leave, taking with them the victim's cash, his shotgun, some supplies, and the keys to his automobile.

As the men were departing from the victim's home, the victim freed himself from his ties and attempted to defend himself and his property. One of the two men[4] responded by shooting the victim once in the mouth and once in the back.[5] The two men then ran to the victim's automobile.

The victim went to a neighbor's house for aid. The police and an ambulance were summoned. The police pursued the two men, who were fleeing in the victim's car. During the pursuit, the defendant leaned out of his car and fired the shotgun taken from the victim.[6] Eventually, the automobile occupied by the men was driven off the road into a field. The defendant fled on foot. The next morning the police apprehended him.

The defendant was transported to the Middleborough State police barracks. After being warned pursuant to *Miranda* v.

---

[4] It is not entirely clear who shot the victim. There was sufficient evidence that the jury could have concluded that the defendant shot the victim or concluded that Bourgeois shot the victim. The victim was shot by the .22 caliber gun the defendant had cleaned the prior weekend.

[5] While initially the victim appeared to be recovering, thirty days after the shooting, the wound to the tongue worsened and the victim bled to death.

[6] There was testimony at trial that the defendant fired at Officer Reddy, who was positioned at a service station. In addition, the defendant fired at Sergeant Ritz, who was directing oncoming traffic out of the way. The defendant also fired at Trooper Doody, an officer in a pursuing vehicle.

*Arizona,* 384 U.S. 436 (1966), the defendant made a statement which was tape recorded.[7]

1. *Pretrial motion to suppress.* The defendant challenges the admission of his taped statement on two grounds. First, the defendant asserts that the statement was not voluntarily given due to his lack of food and sleep. Second, the defendant asserts that the police action in stopping and starting the tape recorder violated his due process rights. After an evidentiary hearing,[8] the judge denied the defendant's motion to suppress the statement. There is no error.

"A conviction founded in whole or in part on statements which are the product of physical or psychological coercion deprives the defendant of his right to due process of law under the Fourteenth Amendment and, as a consequence, is invalid." *Commonwealth* v. *Mahnke,* 368 Mass. 662, 679 (1975), cert. denied, 425 U.S. 959 (1976). If the voluntariness of a confession is raised, the Commonwealth bears the burden of proving voluntariness beyond a reasonable doubt. *Commonwealth* v. *Tavares,* 385 Mass. 140, 152, cert. denied, 457 U.S. 1137 (1982). Evidence of voluntariness must affirmatively appear in the record. *Commonwealth* v. *Parham,* 390 Mass. 833 (1984). Because there is no "acid test" of voluntariness, this court must look to the totality of circumstances to ensure that the confession is a voluntary act and not the "product of inquisitorial activity which had overborne [the defendant's] will." *Mahnke, supra* at 680.

In reviewing a judge's determination of voluntariness, we accept the judge's subsidiary findings absent clear error. *Commonwealth* v. *Monteiro,* 396 Mass. 123, 131 (1985). While we give substantial deference to a judge's ultimate findings and

---

[7] The defendant does not challenge the validity of his waiver of Miranda rights. In his findings of fact, the judge found that the defendant had been advised of his Miranda rights three times and had "knowingly, intelligently, intentionally, and voluntarily waived his right to remain silent and his right to be represented by an attorney." Pursuant to G. L. c. 278, § 33E, we merely note that the record amply supports the judge's findings and conclusion.

[8] The suppression hearing, held on September 21, 1984, involved six witnesses, including the defendant and five police officers.

conclusions of law, we must make an independent review of the correctness of the judge's application of constitutional principles to the facts found. *Commonwealth* v. *Corriveau,* 396 Mass. 319 (1985). *Mahnke, supra* at 667. If the judge finds that the defendant's statement is voluntary beyond a reasonable doubt, "that conclusion 'must appear from the record with unmistakable clarity.'" *Commonwealth* v. *Tavares, supra* at 152, quoting *Sims* v. *Georgia,* 385 U.S. 538, 544 (1967).

The judge made the following findings relevant to the voluntariness of the defendant's confession. The police arrested the defendant in the morning of September 20, 1983. The police chase occurred during the afternoon of September 19, 1983. During these hours prior to arrest, the defendant eluded capture by remaining under a piece of plastic for eight hours. After leaving that hiding place, the defendant fled into some woods, where he spent the night in a tree. The next morning the police caught the defendant standing near a shed and arrested him.

The judge found that the defendant's last full meal before his arrest was breakfast on September 19. During the rest of that day, the defendant consumed two cookies and part of a raw zucchini.[9] After arrest, the defendant was given water, soda, and a doughnut.[10] During the questioning, several breaks were taken, allowing the defendant to smoke a cigarette and collect himself.

The judge found that even if the defendant were tired and hungry on the morning of his arrest due to a lack of sleep or

---

[9] While the defendant testified at the hearing that he never ate anything while in hiding, another witness testified that he had taken squash from a garden near his hiding place. This was corroborated by a photograph taken by the police on the day of arrest. We accept the judge's findings of fact, based on his assessment of the credibility of the witnesses. *Commonwealth* v. *Mahnke,* 368 Mass. 662, 666-667 & n.4 (1975).

[10] Again, the defendant testified that he did not eat the doughnut, but there was testimony to the contrary. Again, we accept the facts as found by the judge. See *Commonwealth* v. *Murphy,* 362 Mass. 542, 547 (1972).

food, that did not necessarily make the statement involuntary. Based on an assessment of the manner of the defendant's speech on the tape, the defendant's responses to questions and his demeanor on the witness stand, the judge concluded that the statement was voluntary. The judge also found that the defendant was not under the influence of alcohol or drugs at the time of questioning, and that the defendant was not threatened or harmed by police during the questioning.[11]

The judge concluded that the defendant's mental process was unimpaired and his will was not overridden in the questioning. The judge found "beyond a reasonable doubt, that the statements . . . were given voluntarily and were the product of a rational intellect . . . ."[12] After review, we conclude that the totality of circumstances supports the judge's conclusion that the statement was voluntary.

We turn to the defendant's arguments concerning the manner in which his statement was taped. The defendant contends that the admission of a tape recorded statement which has been stopped and started during the course of the questioning violates the due process clause of the Fourteenth Amendment to the United States Constitution. It is undisputed that the tape recorder was stopped on several occasions. The judge found that the tape was stopped six or seven times. Because the interview lasted for approximately two hours, the tape had to be turned over or changed at various times. On another occasion, the tape was stopped due to construction noise in the hallway near the interview room. The tape recorder was stopped while the

---

[11] While the defendant claimed that he had been struck by police during interrogation, the judge did not make any findings which support the defendant's contention. The inference is clear that the judge rejected the defendant's assertions.

[12] Because the defendant placed the voluntariness of his statement in issue, the judge properly instructed the jury that they could consider the statement only if they found it was not the product of "fear, threats, coercion or force, either physical or psychological . . . ." See *Tavares, supra* at 152; *Commonwealth* v. *Cole,* 380 Mass. 30 (1980); *Commonwealth* v. *Marshall,* 338 Mass. 460, 461-462 (1959). The defendant does not claim any error on this ground.

defendant was given food and water. The tape recorder also was turned off while the defendant smoked a cigarette. Finally, the judge found that, on at least one occasion, the tape recorder was shut off because the defendant began to cry.

The judge found that the interview lasted approximately 127 minutes, with only 100 minutes taped. He determined that the police action in stopping the recorder was motivated by the needs of the defendant, allowing him to eat, smoke and regain composure after emotional displays. The defendant does not claim that any of his statement was omitted. He simply asserts that his silences and emotional displays should have been preserved on tape for the fact finder. The judge ruled that, despite the stops in the tape, the statement was admissible. We agree. There is no evidence that the tape recording is an unfair representation of the contents of the defendant's statement. Nor is there any evidence that the police were trying to obtain an unfair advantage by the stopping of the tape recorder.

We recognize that there is the potential for abuse if the tape recorder is started and stopped during an interview. The purpose of taping confessions is to preserve reliable evidence of the defendant's statement or confession. The periodic stopping of the tape recorder for reasons other than changing the tape does not further this goal. In the future, the better practice is to leave the tape recorder on during the entire interview, including silences of the defendant, emotional displays by the defendant, or casual conversation among the participants in the interview, so that the fact finders, whether judge or jury, are better able to assess the totality of circumstances.

2. *The prosecutor's closing argument.* The defendant challenges the prosecutor's closing argument on the basis that it was inflammatory and misstated the evidence.[13] We conclude

---

[13] The defendant raises an objection to portions of the prosecutor's summation which concern the first degree murder charge based on deliberate premeditation. The defendant raises a similar issue regarding the first degree murder jury instructions. Because both objections focus on the sufficiency of the evidence, they will be addressed together. See *infra* at 668-669.

that the one misstatement of the prosecutor is insignificant in viewing the summation as a whole.

The prosecutor stated that the victim "drowned, literally drowned, in his own blood." The medical evidence revealed, however, that the victim bled to death. The judge promptly corrected the misstatement.[14] In addition, in his general charge to the jury, the judge reminded the jurors to rely on their memory and not on any statements made by counsel.[15]

In analyzing whether an improper statement has a prejudicial effect, we consider the prosecutor's entire argument, as well as the judge's instructions to the jury and the evidence presented at trial. Based on all these factors, the single misstatement at issue does not require reversal. See, e.g., *Commonwealth* v. *Campbell,* 394 Mass. 77, 88 (1985); *Commonwealth* v. *Bourgeois,* 391 Mass. 869 (1984); *Commonwealth* v. *DeChristoforo,* 360 Mass. 531 (1971), habeas corpus denied sub nom. *Donnelly* v. *DeChristoforo,* 416 U.S. 637 (1974); *Commonwealth* v. *Hogan,* 12 Mass. App. Ct. 646, 651 (1981). Cf. *Commonwealth* v. *Redmond,* 370 Mass. 591, 594 (1976); *Commonwealth* v. *Graziano,* 368 Mass. 325, 332 (1975).

3. *The jury's unrestricted access to the defendant's taped statement.* At trial, the prosecutor and the defendant agreed to allow the jury unrestricted access to the defendant's taped

---

[14] Although the defendant did not request curative instructions, the judge stated: "Before I commence my instructions, let me tell you that the way in which the Assistant District Attorney described how Hollis Jackson met his death was improper. You are instructed to disregard it and not be influenced by his choice of words."

On appeal, the defendant states that he did not seek a curative instruction because he had an "implicit wish not to highlight the argument . . . ." Given the insignificance of the prosecutor's misstatement, it does not appear that the judge's instruction "highlighted" anything the jury did not already know. In addition, the defendant did not bring this concern to the judge's attention in specific enough terms to give the judge an opportunity to respond. See *Commonwealth* v. *McDuffee,* 379 Mass. 353, 357 (1979).

[15] Both the prosecutor and the defense attorney also commenced their summations by informing the jury that their "collective memory" was controlling, not the memory of counsel.

statement during the deliberations. On appeal, the defendant objects to the jury's unrestricted access to the taped statement. However, "[t]he theory of law on which by assent a case is tried cannot be disregarded when the case comes before an appellate court for review . . . ." *Santa Maria* v. *Trotto,* 297 Mass. 442, 447 (1937). See *Commonwealth* v. *Thompson,* 382 Mass. 379, 382 (1981). Pursuant to G. L. c. 278, § 33E, we have reviewed the claim and conclude that the jury's access to the taped statement during its deliberations did not create a substantial likelihood of a miscarriage of justice.

4. *The jury instructions.* The defendant contends that the jury instructions were flawed in numerous respects. The defendant claims error in the proximate cause instruction. In addition, the defendant asserts that the instructions concerning murder and felony-murder were improper. The defendant also contends that the charge pursuant to *Commonwealth* v. *Dickerson,* 372 Mass. 783 (1977), was faulty, and as a result, the judge usurped the function of the jury. Finally, the defendant claims error in the instruction on the offense of assault, while armed with a dangerous weapon, with intent to murder. After examining each of these claims, we conclude that the judge erred in his instructions only on the issue of the intent which must be proved on a charge of assault with intent to murder.

(a) *The proximate cause instruction.* The defendant argues that the judge erred in refusing to give his proposed instruction concerning the victim's medical treatment. In substance, the defendant requested an instruction stating that the defendant is relieved of liability if the jury finds that poor medical treatment intervened between the shooting of the victim and his death.[16]

---

[16] The defendant requested the following instruction: "You must be convinced beyond a reasonable doubt that, assuming Mr. Jackson received competent medical care, he would have died anyway. Putting that another way, you must be convinced beyond a reasonable doubt that there was *no* intervening act, including poor medical care, between the actions of the defendant . . . and the occasion of Mr. Jackson's death which caused Mr. Jackson's death" (emphasis added).

The longstanding rule in this Commonwealth is that "[i]f a person inflicts a wound with a deadly weapon in such manner as to put life in jeopardy, and death follows as a consequence of this felonious and wicked act, it does not alter its nature or diminish its criminality to prove that other causes cooperated in producing the fatal result." *Commonwealth* v. *Hackett,* 2 Allen 136, 142 (1861). In *Hackett,* we recognized that even if the jury finds that the wounds of the victim were improperly treated, which treatment contributed to the death of the victim, the defendant is not relieved of criminal responsibility for his actions. *Id.* at 137.[17] See *Commonwealth* v. *McLeod,* 394 Mass. 727, cert. denied sub nom. *Aiello* v. *Massachusetts,* 474 U.S. 919 (1985); *Commonwealth* v. *Rhoades,* 379 Mass. 810, 823-825 (1980); *Commonwealth* v. *Golston,* 373 Mass. 249 (1977), cert. denied, 434 U.S. 1039 (1978); *Commonwealth* v. *Vanetzian,* 350 Mass. 491 (1966). The judge here correctly refused the defendant's requested instructions, which were contrary to our law. See *Rhoades, supra* at 825.

(b) *The instructions as to murder in the first degree.* The jury convicted the defendant of murder in the first degree. The case was submitted to them on two theories, deliberately premeditated murder and felony-murder. If the conviction is based on deliberate premeditation, the defendant contends that there was insufficient evidence presented at trial to support a guilty verdict.[18] We do not agree.

The victim was shot in his home by one of the two armed intruders. The evidence indicates that the defendant had been seen the prior weekend with the gun which fired the fatal shot. See *supra* at 660. Although, in his statement, the defendant

---

[17] The defendant contends on appeal that the doctor's "grossly erroneous treatment" of the victim should relieve the defendant of liability for the death. There is no evidence that the medical treatment was beneath the standard of "care and skill of the average qualified practitioner, taking into account the advances in the profession." *Brune* v. *Belinkoff,* 354 Mass. 102, 109 (1968). See *Halley* v. *Birbiglia,* 390 Mass. 540, 547 (1983).

[18] The defendant did not file a request for a required finding of not guilty of murder in the first degree. See Mass. R. Crim. P. 25, as amended, 389 Mass. 1107 (1983).

blamed his codefendant for the shooting, the Commonwealth is not bound by the defendant's version of the facts. The prosecution is free to assert that the defendant's statement is not credible. *Commonwealth* v. *Cheek,* 374 Mass. 613, 618-619 (1978). Based on the fair inferences from the evidence, the jury could have found that the circumstances in which the defendant shot the victim supported their conclusion of deliberately premeditated murder.[19] Further, even if the defendant were not the person who fired the fatal shot, there was ample evidence which, if believed, justified the jurors in convicting the defendant of deliberately premeditated murder on the basis of joint enterprise. See *Commonwealth* v. *Watson,* 388 Mass. 536, 544 (1983).

The defendant next argues that the instructions dealing with felony-murder were erroneous.[20] The jury convicted the defendant of the armed robbery, therefore we shall address the felony-murder conviction as based on the underlying felony of armed robbery.[21] The defendant argues that the judge erred in his failure to instruct on constructive malice with respect to armed robbery.

In *Commonwealth* v. *Currie,* 388 Mass. 776, 785 (1983), we said that "the felony of armed robbery, committed with a

---

[19] The defendant raises the victim's conduct, in trying to defend himself, as a mitigating factor. This contention is without merit. As in *Commonwealth* v. *Evans,* 390 Mass. 144, 151-152 (1983), "there is no evidence that the victim's resistance was of such an unreasonable nature as to permit a conclusion that the resulting struggle . . . was not a natural and probable consequence of the armed robbery." In *Commonwealth* v. *Maguire,* 375 Mass. 768, 773 (1978), we recognized that "the right to claim self-defense may be forfeited by one who commits an armed robbery, even if excessive force is used by the intended victim."

[20] While the defendant objected to the felony-murder instructions in several respects, the particular issue raised on appeal was not raised by objection at trial.

[21] The defendant raises a number of issues regarding the instructions of lesser included offenses of armed robbery. Because the jury found the defendant guilty of armed robbery, which clearly can support a felony-murder conviction, error, if any, would not be prejudicial and we do not discuss these contentions.

loaded gun, may not 'be committed in a way not inherently dangerous to human life,' " quoting *Commonwealth* v. *Matchett*, 386 Mass. 492, 508 (1982). "A defendant who kills a victim in the commission or attempted commission of a robbery, while the defendant is armed with a gun, is guilty of murder by application of the felony-murder rule . . . [and] [c]onscious disregard of the risk to human life need not be further shown" (citations omitted). *Commonwealth* v. *Evans*, 390 Mass. 144, 151 (1983). The judge's instructions adequately defined all the elements for conviction of murder in the first degree based on armed robbery. There is no error.

(c) *The Dickerson charge*. The judge instructed the jury that "[i]f the evidence is sufficient to support a verdict of guilty with respect to more than one offense . . . , then you must return a verdict of guilty of the highest crime which has been proved with regard to that indictment beyond a reasonable doubt against the defendant." In *Commonwealth* v. *Dickerson*, 372 Mass. 783 (1977), we said that a charge should include, "in some appropriate form of words, an instruction that the jury have a duty, if they conclude that the defendant is guilty, to return a verdict of guilty of the highest crime which has been proved beyond a reasonable doubt against the defendant." *Id.* at 797. The judge's instruction here appropriately advised the jury of this duty.[22]

The defendant asserts that the judge should have instructed the jury that they were "empowered" to return a lesser verdict than that which the Commonwealth's evidence proves. The defendant asks this court to approve of an instruction informing the jury of their power to nullify the law as stated by the court, in effect sanctioning jury nullification.[23] We decline to do so.

_____

[22] The instructions used by the judge here resemble the instructions which we approved of in *Commonwealth* v. *Diatchenko*, 387 Mass. 718 (1982). In *Diatchenko*, the judge charged the jury that "if you are convinced that it was a murder, . . . you are bound by your oath to bring in the highest degree of murder of which you are convinced he is guilty beyond a reasonable doubt." *Id.* at 728-729. We concluded that this charge was a proper restatement of the suggested instructions of *Dickerson*.

[23] As we read the defendant's brief, he suggests that "the jurors have the inherent right to set aside the instructions of the judge, and to reach a verdict

In *Commonwealth* v. *Hebert,* 379 Mass. 752, 755 (1980), we stated that "it is improper for a juror to disregard the law as given by the judge, [but] it remains within the power of a juror to vote his or her conscience." See generally *Dickerson, supra* at 802-812 (Quirico, J., concurring); Note, Jury Nullification in Historical Perspective: Massachusetts As A Case Study, 12 Suffolk U.L. Rev. 968 (1978). There was no error, much less a miscarriage of justice, in not instructing the jurors on their power of nullification.

(d) *The instruction as to assault, while armed with a dangerous weapon, with intent to murder.* The judge specifically instructed that the crime of assault with intent to murder requires a specific intent to murder. In the course of his instruction, he incorporated his prior definitions of malice aforethought used in explaining the elements of first and second degree murder to explain the specific intent requirement of this crime.[24] The judge did not instruct the jurors that, in order to convict the defendant of assault with intent to murder, the Commonwealth must prove that the defendant harbored a specific intent to kill and that malice "means only absence of justification, excuse, and mitigation." *Commonwealth* v. *Henson,* 394 Mass. 584, 591 (1981). Nor did the judge instruct the jury that the malice which supports a conviction of second degree murder is insufficient to support a conviction of assault with intent to murder.

---

of acquittal based upon their own conscience, and the defendant has the right to have the jury so instructed." Scheflin, Jury Nullification, The Right to Say No, 45 S. Cal. L. Rev. 168 (1972). We recognize that jurors may return verdicts which do not comport with the judge's instructions. We do not accept the premise that jurors have a right to nullify the law on which they are instructed by the judge, or that the judge must inform them of their power. See *Commonwealth* v. *Hebert,* 379 Mass. 752 (1980); *Commonwealth* v. *Ferreira,* 373 Mass. 116 (1977).

[24] In *Commonwealth* v. *Henson,* 394 Mass. 584, 591 n.4 (1985), we cited approvingly Professor Perkins' discussion of the specific intent element of the crime of assault with intent to murder. He states that "it is error to instruct the jury that the same facts and circumstances which would make the offense murder, if death had ensued, will furnish sufficient evidence of intention to convict of assault with intent to murder." R. Perkins, Criminal Law 763 (2d ed. 1969).

Based on *Commonwealth* v. *Henson,* 394 Mass. 584 (1985), *Commonwealth* v. *Ennis, ante* 170 (1986), and *Commonwealth* v. *Shea, ante* 264 (1986), it is clear that these instructions are now erroneous.[25] Although this case was tried before these decisions were rendered, in *Ennis, supra* at 175, we held that *Henson* is retroactive as to this issue. Thus, it governs the instant case.

The Commonwealth argues that, even if the instructions do not fulfil the requirements of *Henson,* the evidence of guilt on these convictions is overwhelming. Therefore, the Commonwealth contends that any error in the jury instructions on this issue does not create a substantial risk of a miscarriage of justice. We do not agree.

The evidence on the issue of the defendant's intent creates a factual issue for the jury. The twelve gauge shotgun used by the defendant was loaded with number 4 "bird shot," capable of killing large birds, and did not have a sight on it. The defendant's statement indicates that he did not intend to kill anyone during the chase, only to discourage the pursuit. The officers' testimony, on the other hand, indicates that the defendant fired directly at them. See *supra,* note 6. Where, as here, the evidence is conflicting, it is for the jurors, not the court, to decide the factual dispute. Therefore, as to the three convictions of assault, while armed, with intent to murder, we reverse the judgments, set aside the verdicts, and remand for a new trial.[26]

We have reviewed the record and conclude that there is no reason to exercise our powers under G. L. c. 278, § 33E, and order entry of a lesser degree of guilt or a new trial on the conviction of murder in the first degree. The convictions of armed robbery, assault, while armed, with intent to rob a

---

[25] We recognize that the judge did not have the benefit of our decisions in *Henson, supra* at 584, and *Ennis, supra* at 170.

[26] The concurrent sentences on these convictions are from and after the sentence on the conviction of murder in the first degree; therefore, we conclude that the defendant is prejudiced and there is a substantial risk of a miscarriage of justice. *Commonwealth* v. *Freeman,* 352 Mass. 556 (1967).

victim over sixty-five years old,[27] and assault and battery by means of a dangerous weapon on a victim over sixty-five years old are affirmed.

*So ordered.*

.

---

[27] The defendant raises no issue regarding the instructions on the conviction of assault, while armed, with intent to rob a victim over sixty-five. See *Henson, supra* at 584. The convictions of armed robbery and assault with intent to rob a victim over sixty-five are so closely related factually that a sentence on both may not be appropriate. See *Commonwealth* v. *Jones,* 382 Mass. 387 (1981); *Kuklis* v. *Commonwealth,* 361 Mass. 302 (1972). But the sentence on the conviction of assault with intent to rob is concurrent with the sentences for armed robbery, assault and battery by means of a dangerous weapon on a victim over sixty-five years old, and murder in the first degree; therefore, under the *Freeman* standard, we conclude that there is no substantial risk of a miscarriage of justice.